T.C. Memo. 2004-46

UNITED STATES TAX COURT

ESTATE OF LEA K. HILLGREN, DECEASED, MARK HILLGREN, EXECUTOR,
Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13394-01.                    Filed March 3, 2004.

Paul Frederic Marx, for petitioner.

Thomas J. Fernandez, Hieu C. Nguyen, Edwin Herrera, for
respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, Judge:  Respondent determined a deficiency of
$1,269,498 in the Federal estate tax of the estate of Lea K.
Hillgren (decedent), Mark Hillgren, executor, and an accuracy-
related penalty under section 6662(a) of $247,691.  After

concessions by the parties, the issues for decision are:
(1) Whether an entity entitled "The Lea K. Hillgren Partnership, A California Limited Partnership" (LKHP or partnership) is a partnership that should be disregarded under section 2036(a) in valuing seven properties in which decedent had an interest; (2) the effect of a Business Loan Agreement (BLA) between decedent and her brother on the value of four properties in which decedent had an interest. Respondent concedes that the estate is not liable for the accuracy-related penalty under section 6662.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect as of the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Lea K. Hillgren (decedent) was a resident of California at the time of her death. The executor of decedent's estate, her brother, Mark Hillgren (Hillgren), resided in California when the petition in this case was filed.

### Decedent's Background

Decedent graduated from California State University with a degree in restaurant and hotel management. She was a restaurant manager for Hamburger Hamlet, attended cooking school in France,

and was in the catering business at various times. In 1978 and 1979, decedent was a professional snow skier. Later in her life, she was a golfer. During her life, decedent owned various income-producing properties that she acquired through a combination of purchase and inheritance from her grandfather. Decedent did not marry and did not have any children.

Decedent was treated for mental illness beginning in 1984. Decedent's psychiatrist, Dr. Carolyn Hays (Hays), practiced psychiatry in Beverly Hills, California. Hays began treating decedent for depression in 1987 and treated her regularly beginning in 1994.

Decedent's boyfriend in 1996, Michael O'Brien (O'Brien), was a golf professional at decedent's golf club. O'Brien was approximately 10 years younger than decedent. Around October 1996, decedent ended her relationship with O'Brien.

On October 31, 1996, decedent attempted to commit suicide by intentional overdose of medications and alcohol and by carbon monoxide poisoning. The attempt was unsuccessful because she was discovered by a police officer. She was taken to Hoag Memorial Hospital Presbyterian (Hoag hospital) in Newport Beach, California, and was admitted for treatment for a week or two at Cedars Sinai Medical Center (Cedars Sinai) in Los Angeles, California. Decedent's treating psychiatrist at Cedars Sinai and

Hays changed decedent's medication, prescribing a new antidepressant for her.

After decedent's suicide attempt, she tried to resume her relationship with O'Brien. The relationship did not continue, and O'Brien seemed to lose interest in decedent.

On March 21, 1997, decedent was admitted to Hoag hospital for pain in her arm and neck. At the time, she was taking five different medications. Decedent also suffered from a degenerative disc disease of the cervical spine. On March 28, 1997, decedent received a cervical epidural steroid for her back pain at Hoag hospital. On June 5, 1997, at the age of 41, decedent committed suicide by carbon monoxide poisoning. According to Hays, several factors possibly contributed to decedent's suicide, including the relationship with O'Brien; the death of decedent's cat; and a combination of prescription medication that decedent was improperly taking.

Decedent was survived by her parents, Carl C. Hillgren and Kay Schureman; by her brother, Hillgren; and by Hillgren's children, Sophia M. Hillgren and Carl R. Hillgren.

The Original Lea K. Hillgren Trust

On April 10, 1984, decedent established the Lea K. Hillgren Trust (original trust). Under the original trust, decedent could revoke or amend the trust, in whole or in part, during her lifetime. Decedent and Hillgren were named as cotrustees of the

original trust, and Hillgren was named as the beneficiary. The "Schedule I" attached to the original trust specified the property that was transferred to the trust and included shares of stock in Sea Shell Properties, Limited (Sea Shell Limited), and unspecified real estate partnership interests. On November 24, 1986, decedent executed a durable power of attorney, appointing Hillgren as her agent.

Business Entities

Prior to 1988, decedent, as trustee of the original trust, owned a California corporation, Sea Shell Limited. In December 1988, Sea Shell Limited dissolved, and all of its assets were distributed to decedent as trustee of the original trust. Decedent then conducted business as a sole proprietor under the name Sea Shell Properties. ("Sea Shell" will be used to refer to Sea Shell Properties and its predecessor and related entities that were essentially controlled by decedent and bore names used interchangeably in referring to decedent's business activities.) On December 12, 1997, after decedent's death, Hillgren filed a fictitious business name statement in California for Sea Shell Limited, naming decedent as the registrant.

As of the date of decedent's death, Hillgren had worked in the real estate industry for 27 years. Prior to December 1986, Hillgren established, merged, and dissolved various entities, some with similar names, to conduct his real estate activities.

In December 1986, one of Hillgren's entities, Seaward Properties, Limited, dissolved, and its assets were distributed to Seaward Partners, a California general partnership owned 89 percent by Hillgren and 11 percent by Carl C. Hillgren. ("Seaward" will be used to refer to Seaward Partners and its predecessor and related entities that were essentially controlled by Hillgren.) From 1987 through 1997, Hillgren held a general partnership interest in two partnerships, LKHP and Seaward. Seaward also held general partnership interests in three other partnerships. At the date of decedent's death, Hillgren had executed several certificates of partnership.

Business Loan Agreement

Around April 1994, decedent and Hillgren entered into the BLA, which was drafted by their attorney, Jeffrey Walsworth (Walsworth). The BLA described a series of events occurring between decedent, doing business as Sea Shell and referred to as the "debtor", and Hillgren, doing business as Seaward and referred to as the "lender". The BLA was signed by decedent and Hillgren, but was undated. The term of the BLA was for 29 years. The BLA was never recorded.

Several properties were the subject of the BLA. The BLA discussed "Properties" (Orange County properties) as described in exhibit "A" and the "University Industrial Park" (University property) as described in exhibit "B". The Orange County

properties, however, were actually described in exhibit B, whereas the University property was described in exhibit A, because the exhibits were inadvertently switched when the BLA was signed.  The Orange County properties included properties on West Collins Avenue (West Collins), North Main Street (North Main), and North Enterprise Street (Enterprise) in Orange County, California.

The BLA provided that, in exchange for the consideration given by Hillgren, decedent encumbered the Orange County properties as collateral for the fulfillment of decedent's obligations to Hillgren.  Hillgren also had the sole right and discretion to determine if and when any of the Orange County properties should be sold for up to 29 years after the date of the BLA.  As stated in the BLA, Hillgren would also provide $1 million, if necessary, to maintain decedent's financial obligations in the University property.  Decedent granted to Hillgren a 25-percent interest in "all net cash sales/refinance proceeds" (25-percent lender interest) from the University property.  The 25-percent lender interest was defined in the BLA as any cash proceeds available from refinancing or cash from a sale of the property, after payment of all preexisting debts. The BLA appointed Hillgren as decedent's "attorney-in-fact" for the duration of the contract.  Pursuant to the BLA, decedent paid delinquent property taxes.

1.  Purchase of the University Property

The University property was a multitenant industrial park located in Tempe, Arizona.  In December 1985, the University property was acquired by Hillgren and decedent from the Huettner Limited Partnership (Huettner).  Hillgren signed the purchase agreement as the "buyer" of the property.  The University property was purchased for $3,831,800 with cash of $319,194.78, assumption of the existing mortgage of $1,518,432.05 (Safeco loan), and assumption of a second mortgage previously carried by Huettner of $1,966,567.95 (Huettner loan).  The loans on the property were nonrecourse.

Under the warranty deed for the property, Sea Shell and Seaward each held title to 50 percent of the property.  On December 23, 1985, a promissory note for the Huettner loan made Sea Shell and Seaward jointly and severally liable on the debt. Hillgren signed the promissory note as president and secretary of Seaward and as vice president of Sea Shell.  On July 1, 1986, Seaward executed a quitclaim deed where it relinquished its interest in the University property to Sea Shell.  The quitclaim deed on the University property was not recorded until May 23, 1994.

2.  Financing of the University Property

The BLA recited that Hillgren had assisted decedent in her acquisition of the University property by lending her $485,000.

In 1986, decedent suffered a "negative cashflow exclusive of depreciation" exceeding $115,000 on the University property. After 1986, decedent continued to incur a negative cashflow on the property. In 1987, due to the financial problems associated with the University property, Hillgren "facilitated" a loan of $400,000 from Louis Puccio to decedent (Puccio loan). On April 27, 1988, in his capacity as trustee of the original trust, Hillgren signed a promissory note between Louis Puccio and Sea Shell. The promissory note was secured by a deed of trust on the North Main property. According to the BLA, by 1988, decedent owed $285,000 to Hillgren and $400,000 on the Puccio loan. From 1988 through 1993, decedent continued to incur a negative cashflow on the property, she did not pay the Puccio loan, and she continued to be indebted to Hillgren.

The BLA recited that, as of 1994, decedent owed $1.3 million on a first trust deed (Safeco loan) and $1.5 million on a second trust deed (Huettner loan), both secured by the property, in addition to the Puccio loan and her remaining debt of $150,000 to Hillgren. In August 1994, the Huettner loan and the Puccio loan were to become due and payable, but decedent was unable to pay the loans because of her negative cashflow on the property. The BLA provided that Hillgren assist decedent in obtaining an extension of the Puccio loan and that Hillgren became a guarantor of the loan. On May 11, 1994, Hillgren executed a Forbearance

and Guaranty Agreement on the Puccio loan, extending the collection of the principal of the loan until January 1, 2001. Hillgren also placed his assets as collateral on the Puccio loan.

Hillgren assisted decedent in obtaining a forbearance and extension on other loans as well, including the Huettner loan. On May 1, 1994, the terms of the Huettner loan were modified, reducing the amount of the loan to $1,481,567.95. To secure the payment of the modified loan, Sea Shell and Seaward executed a second in priority deed on the "Arizona Property" and a deed of trust on the North Main property, in favor of Huettner. (It is unclear from the exhibit whether the "Arizona Property" referred to is the same as the University property or is another property owned by Nordica Properties (Nordica), a California general partnership, also owned by decedent and Hillgren, which owned properties in Phoenix, Arizona.) On April 15, 1994, Hillgren and Carl C. Hillgren modified the Safeco loan by becoming guarantors of the loan, reducing the interest rate and extending the maturity date.

3. Refinancing of the University Property

On May 20, 1999, the University property was refinanced by LKHP when a new first mortgage in the amount of $2.5 million was obtained from Baltimore Life Insurance Co. As a result of the refinancing, the net cash proceeds totaled $369,329. Hillgren did not receive a distribution of loan proceeds during the

refinancing in accordance with his 25-percent lender interest in proceeds from refinancing as provided by the BLA.  In 2001, however, in his capacity as general partner of LKHP, Hillgren paid himself $92,332, representing 25 percent of the net loan proceeds from the 1999 refinancing of the University property.

The Amended Trust

On January 29, 1997, the original trust was amended and restated (amended trust).  Decedent and Hillgren were named as cotrustees of the amended trust.  Whereas Hillgren was the beneficiary of the original trust, Hillgren and his two children were the beneficiaries of the amended trust.  The amended trust provided for payment of the estate's expenses and taxes after decedent's death.

The amended trust was funded by the items listed in "Schedule A".  Schedule A included:  The Orange County properties, the University property, a partnership interest in Nordica, decedent's personal residence, three other properties (Crescent Bay, Railroad, and Manzanita), and several additional assets including bank accounts.  Also on January 29, 1997, decedent executed a will, naming Hillgren and his children as the sole beneficiaries of decedent's estate.

Loans Between Decedent and Hillgren

Over a number of years, decedent and Hillgren engaged in several loan transactions.  When one sibling needed money, the

other would lend money.  In 1994, Hillgren was paying decedent
10-1/2 percent interest whereas decedent was paying Hillgren
8-1/2 percent.  Separate loan accounts were maintained for loans
between decedent (doing business as LKHP, the amended trust, or
Sea Shell) and Hillgren (doing business as Seaward).  One account
tracked the amounts borrowed by decedent from Hillgren, and
another account tracked the amounts borrowed by Hillgren from
decedent.  The balances in the two accounts were reported
separately in the general ledger and financial statements of LKHP
and the amended trust.  Sea Shell's balance sheets for 1987
through 1994 did not reflect accrued interest on the loans
between decedent and Hillgren, nor was interest included in the
balances of these loans when computing the net asset value of
LKHP as reported on decedent's estate tax return.  The accrued
interest on the loans from Seaward to Sea Shell was not paid
until December 1997, and the accrued interest on the loans from
Sea Shell to Seaward was not paid until 1998.

In December 1993, decedent sold a house, and the proceeds
were disbursed to Seaward as the $20,000 remaining principal on a
loan and $265,000 as a new loan to Seaward.  At the time that the
BLA was signed, if the balances in the accounts were netted,
Seaward owed more money to Sea Shell than Sea Shell owed to
Seaward.

The Partnership

    1.  Formation of LKHP

Decedent and Hillgren formed LKHP with an effective date of January 1, 1997. The term of the partnership was set for 29 years. Walsworth represented both decedent and Hillgren in the formation of the partnership. Decedent held a 99.95-percent capital interest and a 75-percent profit interest in LKHP. Decedent gave Hillgren a .05-percent capital interest and a 25-percent profit interest in the partnership. The term "profit interest" was defined in the partnership agreement as "a partnership interest other than a capital interest * * * which will give rise to a partnership capital account * * * only if and when there is future economic income" (25-percent profit interest). The partnership agreement also provided Hillgren with 25 percent of the amount, if any, by which the partnership profits from operations in any year exceeded profits from operations realized by decedent in 1996 from the properties transferred (25-percent operational interest). The 25-percent operational interest was compensation to Hillgren for time spent in the management of LKHP. Decedent made no other gifts of partnership interests.

Decedent contributed seven properties (the LKHP properties) to LKHP, as described in exhibit B to the partnership agreement. Hillgren did not contribute any property to LKHP. The seven LKHP

properties that were contributed to the partnership at its formation included the three Orange County properties and the University property that were already the subject of the BLA and that were used to fund the amended trust. In addition, the other three properties that were contributed were the Crescent Bay, Railroad, and Manzanita properties in California that also previously were used to fund the amended trust. After the initial contributions were made, no additional property was transferred to the partnership.

Decedent did not deed or transfer title to the seven LKHP properties to the partnership. The partnership agreement provided that title to any property that was contributed by a limited partner, and was deemed to be owned by the partnership, would remain in the name of the limited partner for the benefit of the partnership. The leases that encumbered the LKHP properties were not formally assigned to LKHP prior to decedent's death. The leases remained in the name of decedent, or in the name of Sea Shell, after LKHP was formed. The title remained in the name of decedent or Sea Shell in order to hide the change of ownership from the general public and from the tenants of the properties. Under the partnership agreement, Hillgren could conduct partnership business without disclosing the existence of the partnership. The partnership was designed generally to be

invisible to the public and to persons with whom decedent and Hillgren did business.

On May 27, 1997, decedent executed seven quitclaim deeds, transferring her interest in the LKHP properties to the amended trust. The deeds were unrecorded at the time of her death. Also on May 27, 1997, decedent assigned her partnership interest to the amended trust.

2. Operation of LKHP

The partnership agreement provided that the general partner need not open a bank account in the name of the partnership, but could instead maintain the existing bank account that was used by Sea Shell and the amended trust. As a result, LKHP did not have a dedicated bank account during decedent's lifetime. Decedent held a bank account at Wells Fargo Bank (Wells Fargo) that operated under the name of the amended trust, doing business as Sea Shell. The Wells Fargo account was used for operation of LKHP.

LKHP's financial statement dated June 5, 1997, and its general ledger from January 1 through June 30, 1997, included decedent's residence, the mortgage on her residence, and the mortgage and property tax payments that were made on the residence. Decedent's residence and the expenses attributed to the residence were removed from the ledger in a journal entry by an adjustment dated January 1, 1997. The adjusted journal entry

was not posted until after decedent's death. It was the practice of decedent and Hillgren to post the opening entries on their accounting books anywhere from 6 to 8 months after the start of the year. As a result, the opening entries for LKHP were not made until after decedent's death. Also, the balance sheets, ledgers, and check registers that represented the financial information of LKHP were actually maintained under the name of Sea Shell.

After the formation of LKHP, leases were executed on the LKHP properties in the name of Sea Shell. Also after the formation, all contracts that were entered into for maintenance and improvement of the LKHP properties, as well as all bills that were received, were in names other than that of LKHP. On March 12, 1997, a check was issued under the name of Sea Shell to pay property taxes for various properties including Manzanita and Enterprise. On May 22, 1998, Sea Shell also paid for landlord's insurance on the Manzanita property.

After the formation of LKHP, Nordica completed refinancing of its properties. During the loan application process, it was represented to a mortgage broker, Walker Mortgage, and a lender, Homesteader's Life Co., that decedent owned and controlled all of the LKHP properties. No mention was made to either the mortgage broker or the lender that the properties were restricted by the BLA or that they were owned by LKHP. The disclosure was not made

to the lender because it might have caused the refinancing to fail.

There were no recorded minutes of any meetings of partners of LKHP. On May 13, 1999, after decedent's death, a certificate of limited partnership was filed for LKHP with the California Secretary of State.

3. LKHP Distributions

The partnership agreement provided for distributions of cash at the sole discretion of Hillgren, as the general partner. From January 1 through June 5, 1997, decedent received distributions totaling $99,363. Hillgren did not receive any distributions during this period. The distributions that were received by decedent during 1997 were made specifically to enable decedent to pay her living expenses, and she was dependent on the cashflow of the partnership to cover her personal expenses.

LKHP also paid the costs of the estate. On March 5, 1998, distributions in the amounts of $135,000 and $80,000 were made from the partnership to the amended trust. The distributions were applied to pay installments of decedent's estate taxes due to the Internal Revenue Service (IRS) and to the California State Treasurer. From 1998 until 2002, distributions were consistently made from LKHP to the amended trust to continue payment of decedent's estate taxes to the IRS and to the California Franchise Tax Board.

4.  Management of the LKHP Properties

MSL Properties, Inc. (MSL), is a property management company in Orange, California, with the same business address as Hillgren.  Debra Gates (Gates) is the president and registered agent of MSL.  Gates and decedent met in 1984 and became friends. Decedent appointed Gates as an alternate under decedent's durable power of attorney for health care.

Since MSL was incorporated in 1986, MSL continuously managed properties that were owned by Hillgren family entities.  MSL had approximately 12 clients in addition to LKHP, all of which were related entities of the Hillgren family.  The related entities included, among others, the amended trust, Carl C. Hillgren, Hillgren, Hillgren's children, the Mark Hillgren Children's Trust, and Seaward.  The duties that were performed by MSL included property management, general office functions, and bookkeeping.  Gates worked with decedent in managing the properties, and decedent would set parameters for Gates's responsibilities.

Prior to the formation of LKHP, MSL managed the seven LKHP properties.  In 1997, MSL continued to manage the LKHP properties after the formation of LKHP.  Gates understood that LKHP was to continue using the Wells Fargo bank account, used previously by Sea Shell and the amended trust, after the partnership commenced.

To perform its bookkeeping duties, MSL gave each client an individual company number in order to keep their books. The LKHP properties were managed under "company number 50" prior to the formation of LKHP. From January 1 through June 30, 1997, the LKHP properties continued to be managed for LKHP under company number 50. After formation of the partnership, the books remained the same as before. Gates planned to make journal adjustments for the partnership for "year-end tax return purposes".

5. <u>LKHP's Federal Tax Returns</u>

For 1997, LKHP filed a Form 1065, U.S. Partnership Return of Income (1997 return). The 1997 return reported no ordinary income to LKHP. On LKHP's Schedule K, Partners' Shares of Income, Credits, Deductions, etc., the partnership reported net income from real estate activities of $93,304, depreciation of $1,011, and distributions of $100,601. On LKHP's Schedule K-1, Partner's Share of Income, Credits, Deductions, etc., filed for the amended trust, as a partner, the partnership reported income from rental activities of $93,257, depreciation of $1,010, and distributions of $100,601. The amended trust was allocated a 99.95-percent interest in LKHP. The Schedule K-1 filed for Hillgren reported income from rental activities of $47 and depreciation of $1. The schedule of activities that was filed with the 1997 return reported rental real estate income or loss

associated with the seven LKHP properties as allocated to both the amended trust and Hillgren, as reported on their respective Schedules K-1.  The partnership also filed a statement with the 1997 return notifying the IRS that it intended to file an amended return.

For 1997, LKHP filed an additional Form 1065 as an amended return (1997 first amended return).  The 1997 first amended return made an election to adjust the basis in the LKHP properties under section 754.  The Schedule K and Schedules K-1 remained the same as in the original return.

Also for 1997, LKHP filed an additional Form 1065 as an amended return (1997 second amended return).  The 1997 second amended return was filed to correct the allocation of partnership income as 75 percent to the amended trust and 25 percent to Hillgren.  The Schedules K-1 for the amended trust, and for Hillgren, were adjusted for this change, showing that the amended trust held a 99.0027-percent capital interest and a 75-percent profit interest and that Hillgren held a .9973-percent capital interest and a 25-percent profit interest.  As a result, the net income from real estate and the depreciation on the Schedules K-1 were reallocated accordingly.  The reported distribution of $100,601 to the amended trust remained allocated to the amended trust on the Schedule K-1.

For 1998, LKHP filed a Form 1065 (1998 return) with attached Schedule K reporting net income of $389,124 and distributions of $423,500.  The 1998 return's Schedule K-1 for the amended trust reported allocations of $388,929 of income in accordance with the 99.95-percent profit interest and the entire amount of the distribution.  Hillgren's Schedule K-1 reported $195 in income and no distribution.  Also for 1998, LKHP filed an amended Form 1065 (1998 amended return).  The 1998 amended return reduced the net income to $320,369 and reported guaranteed payments to partners of $68,755.  The distribution remained unchanged.  Similar to the 1997 second amended return, the 1998 amended return reported a corrected allocation of the 25-percent profit interest to Hillgren.  The income that was reported on the Schedules K-1 was reallocated accordingly, but the amount of the distribution to the amended trust remained the same.

For 1999, LKHP filed a Form 1065 and an amended Form 1065 to report again the corrected allocation of the profits interest and to report guaranteed payments to partners.  For 2000 and 2001, LKHP filed Forms 1065 with the correct allocation of the profits interest, and no amended returns were filed.

Estate Tax Return

On August 28, 1998, the estate filed decedent's Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return (estate tax return).  The estate provided financial

statements and a summary of liabilities to Higgins, Marcus & Lovett, Inc., who prepared the appraisal (Higgins appraisal) of decedent's interest in LKHP. The Higgins appraisal was filed with the estate tax return.

The Higgins appraisal was conducted on behalf of the estate by Thomas E. Higgins (T. Higgins), an Accredited Senior Appraiser of the American Society of Appraisers, and by Mark C. Higgins (M. Higgins), an Accredited Member of the American Society of Appraisers. Both T. Higgins and M. Higgins specialize in the business valuation discipline. The appraisal was dated June 22, 1998, but valued the partnership interest as of June 5, 1997. The estate's attorney, Richard Albrecht (Albrecht), instructed the appraisers to value the interest as a limited partnership interest. The Higgins appraisal reported that the fair market value of decedent's 99.95-percent limited partnership interest in LKHP on June 5, 1997, was $2,266,000, after discounts for lack of marketability and for lack of control. On the estate tax return, decedent's gross estate was reported as $2,543,378. On February 3, 1999, respondent commenced an examination of the estate tax return.

Examination

On February 4, 1999, the IRS sent an audit letter to Maurice Polner, the accountant for the estate. On May 23, 2001, Hillgren responded to questions that were posed by IRS estate tax attorney

Jay Goldenberg (Goldenberg). Hillgren answered questions regarding the BLA, LKHP, the appraisal of decedent's interest in LKHP, and a mortgage.

In response to questions regarding the BLA, Hillgren told Goldenberg that he did not know when the BLA was signed and that Walsworth drafted the agreement. Hillgren also told Goldenberg that he complied with the requirements in the BLA to extend the Huettner and Safeco loans. Hillgren stated that the only document that encumbered the properties that were subject to the BLA was the agreement itself. Hillgren stated that he took over management control of the properties subject to the BLA but that he also controlled the day-to-day management of decedent's other properties not subject to the BLA.

In response to questions that were posed by Goldenberg regarding LKHP, Hillgren explained the purpose of forming the partnership as "Lea suffered from depression. She did not have a husband. She was dating a young guy. He was worried about his motives and she was worried too. The Partnership served as an asset protection." Hillgren gave the same answer in response to questions as to why they formed the partnership when Hillgren was already managing decedent's properties under the BLA. Hillgren also stated that his rights under the BLA were senior to the partnership agreement and that he gave his consent for the transfer of the properties to LKHP.

On August 24, 2001, a notice of deficiency was sent to the estate. The notice increased the value of decedent's interest in LKHP. The notice determined decedent's 99.95-percent interest in LKHP to be valued at $4,526,740 based upon the undiscounted values of the LKHP properties. The notice determined a deficiency in the estate tax of $1,269,498. The increased values, as determined in the notice, were not supported by independent appraisals because LKHP was not recognized as a valid partnership entity.

Value of the LKHP Properties as Agreed by the Parties

The parties have stipulated the undiscounted values of decedent's interest in the seven LKHP properties as follows:

| Property | Value |
|----------|-------|
| West Collins | $1,285,000 |
| Enterprise | 1,093,787 |
| North Main | 975,000 |
| University property | 1,074,131 |
| Manzanita | 2,261 |
| Crescent Bay | 265,176 |
| Railroad | 115,711 |
| Total | $4,811,066 |

OPINION

Burden of Proof

Generally, under section 7491(a), in any court proceeding, if a taxpayer introduces credible evidence with respect to any factual issue, the burden of proof is shifted to respondent. The burden shifts, however, only when the taxpayer has maintained all records and has cooperated with reasonable requests by respondent

for witnesses, information, documents, meetings, and interviews. Sec. 7491(a)(2)(B); see Higbee v. Commissioner, 116 T.C. 438, 440-441 (2001).

The parties dispute whether the burden shifts to respondent in this case. The estate argues that respondent has the burden of proof because the estate has satisfied all of the conditions under section 7491. The estate contends that it responded by fully cooperating with respondent's requests for witness interviews and by responding to numerous requests for information and documents during audit. Respondent, however, argues that the estate did not comply with the substantiation and record-keeping requirement under section 7491(a)(2)(A) and that the estate did not cooperate as required under section 7491(a)(2)(B). Respondent also argues that the estate failed to introduce credible evidence, stating, instead, that the estate has introduced "evidence that is internally contradictory and inconsistent, and not worthy of belief."

We agree with respondent that the estate's evidence was sometimes inconsistent and that Hillgren had made inaccurate and misleading representations prior to trial. There is no evidence, however, that the testimony at trial was false or implausible. Respondent often objected to the estate's proposed findings of fact on the ground that they are "biased and self-serving". This obvious comment is insufficient, without more, to contradict the

estate's testimony.  It is unnecessary, however, to prolong our discussion of burden of proof.  We decide the issues based on the preponderance of the evidence.

Section 2036

We must decide whether the existence of LKHP will be recognized for estate tax purposes.  Respondent argues that the value of the properties that were transferred to LKHP is includable in decedent's gross estate under section 2036(a).  The estate argues, however, that LKHP was a valid partnership, formed under California law and created as a premarital asset protection device.

Under section 2036(a), a decedent's gross estate includes the value of property interests transferred by the decedent during his or her lifetime if the decedent retained for life the possession or enjoyment of the property, or the right to the income from the property, or the right to designate the persons who would possess or enjoy the property or the income from the property.  The general purpose of section 2036(a) is to include in a decedent's gross estate transfers of property that are "essentially testamentary in nature".  Estate of Ray v. United States, 762 F.2d 1361, 1362 (9th Cir. 1985) (quoting United States v. Estate of Grace, 395 U.S. 316, 320 (1969)).  An asset transferred by a decedent during his or her lifetime is included in his or her gross estate unless he or she "absolutely,

unequivocally, irrevocably, and without possible reservations, parts with all of his title and all of his possession and all of his enjoyment of the transferred property." Commissioner v. Estate of Church, 335 U.S. 632, 645 (1949).

Under section 2036(a), a transferor retains the enjoyment of the property transferred if there is an express or implied agreement at the time of the transfer that the transferor will retain the present economic benefits of the property, even if the retained right is not legally enforceable. See Estate of Reichardt v. Commissioner, 114 T.C. 144, 151 (2000); sec. 20.2036-1(a), Estate Tax Regs. In deciding whether there was an implied agreement, the Court considers all of the facts and circumstances surrounding the transfer and the subsequent use of the property. See Estate of Reichardt v. Commissioner, supra at 151. Where the decedent conveys all or nearly all of his or her assets to a trust or partnership, this may suggest an implied agreement that the decedent can continue to use the assets. See id. at 153. Section 2036 applies not only if a transferor retains possession or enjoyment of property but also if a transferor retains the right to income from the property. See sec. 2036(a)(1); Estate of Reichardt v. Commissioner, supra at 153. Moreover, if a decedent's relationship to the assets transferred to a partnership remains the same after the transfer as it was before the transfer, the value of the assets may be

included in the decedent's gross estate.  See sec. 2036(a)(1); Estate of Reichardt v. Commissioner, supra at 152.

Section 2036(a) does not apply if the transfer of property was part of a bona fide sale in exchange for full and adequate consideration.  A bona fide sale is an arm's-length business transaction between a willing buyer and a willing seller.  Estate of Reichardt v. Commissioner, supra at 155.

The estate argues that there was no agreement, express or implied, that decedent would retain the possession, control, or enjoyment of, or the right to the income from, the partnership. The estate contends that, because the partnership was in existence for only 5 months at the time of decedent's death, there was not enough time to establish a pattern of history or behavior from which respondent could imply an agreement.

Respondent contends that, shortly after decedent's initial suicide attempt, decedent executed her will, the amended trust, and the LKHP agreement, thereby transferring substantially all of her assets.  Respondent argues that the practical effect of the partnership was minimal because decedent continued to be the sole economic beneficiary of the property that was contributed to the partnership.

1.  <u>Formation of LKHP as a Premarital Asset Protection
    Device</u>

The estate contends that the creation of LKHP was motivated by legitimate business concerns and for premarital asset protection.  The estate further contends that decedent and Hillgren negotiated the terms of the partnership agreement at arm's length under "adverse economic interests".

First, with respect to the claim that the partnership served as a premarital asset protection device, respondent notes that decedent and her boyfriend broke up before her initial suicide attempt and that it was unclear from the record whether they were intending to get married.  Respondent also notes that the estate made inconsistent representations during discovery and during trial as to whether decedent's boyfriend was even aware of the partnership.  Respondent further argues that, as a premarital asset protection device, the partnership agreement would fail because decedent had the right to transfer her interest to a spouse and had the power to approve a transfer to her spouse.

There is nothing in the language of the LKHP agreement stating the reasoning behind the formation of the partnership. The estate's claim that the partnership served to protect decedent's assets from an impending marriage to O'Brien is unsupported by the record.  Title to the properties remained solely in decedent's name, potentially within the reach of a

spouse.  There is no evidence that O'Brien knew of the existence of LKHP.  The partnership was intended to be largely invisible.

Goldenberg testified that, during the examination of the case, the estate did not mention that the partnership agreement was intended as a "premarital tool".  The estate told Goldenberg that the partnership served as an asset protection vehicle.  Goldenberg further testified that, if he had known of the premarital reason for the partnership agreement, he would have identified O'Brien to interview him.  We are therefore not persuaded by the testimony that LKHP was formed to provide premarital asset protection.

Second, with respect to the estate's claim that the partnership was formed as a result of arm's-length negotiations, we are not persuaded that decedent and Hillgren acted at arm's length.  The estate contends that Hillgren made a significant contribution to the partnership, to wit, the services that he was to provide to the partnership as a general partner with a 25-percent profit interest.  The estate argues that decedent and Hillgren bargained over what his profit interest would be in the partnership.  The estate claims that the negotiation between decedent and Hillgren distinguishes this case from that of Estate of Harper v. Commissioner, T.C. Memo. 2002-121, where the decedent stood on both sides of the transaction.  The record, however, indicates that Hillgren was not only a general partner

in the partnership but was also cotrustee of the amended trust and a "lender" to decedent regarding the same properties that were transferred to the partnership. At various times, Hillgren signed his name on documents as trustee of both the original and amended trusts, as vice president of Sea Shell, as an officer of Seaward, and as general partner of LKHP. As a result, Hillgren stood on every side of the transaction. The same lawyer represented decedent and Hillgren with respect to the formation of the partnership. In addition, the estate provided no corroboration of the negotiation between decedent and Hillgren regarding Hillgren's interest. Hillgren ignored the terms of the partnership agreement as it suited him. Further, because the management functions did not change and were still performed by MSL after the formation of the partnership, it is hard to believe that Hillgren contributed sufficient services at the formation of the partnership to warrant his 25-percent profits interest. (This case is further indistinguishable from Estate of Harper v. Commissioner, supra, as discussed below because of the commingling of funds, the "egregious" disregard for the partnership form, and the existence of post mortem accounting manipulations.)

   2. How Formation of LKHP Failed To Alter Decedent's
      Interest

In this case, neither decedent's interest in the properties that were transferred to the partnership nor legal title changed

once the partnership was established.  MSL provided the day-to-day management services for the properties both before and after the creation of the partnership.  The tenants of the LKHP properties were unaware of the supposed change in ownership. Decedent continued to use Sea Shell's bank account for the partnership income, contracts and leases that were executed after the formation of the partnership remained under Sea Shell's name, and bills remained in Sea Shell's name.  Representations were made to third parties, including to a mortgage broker and a lender during the Nordica refinancing, that decedent owned and remained in control of the LKHP properties.

Hays also testified that decedent did not expect that the partnership would change the relationship between decedent and Hillgren or change decedent's role in the management responsibility for her property.  Moreover, Hillgren told Goldenberg during the examination that he took over management control of the properties subject to the BLA and that he also controlled the day-to-day functions of decedent's other properties.  This arrangement did not change as a result of the partnership agreement.

Respondent notes an apparent initial intent to transfer decedent's personal residence as shown in the partnership's financial statements, which were adjusted after decedent's death. The later adjustment was an attempt to reverse the initial

commingling of funds between the partnership and decedent.  See, e.g., Estate of Reichardt v. Commissioner, 114 T.C. at 155. Gates testified that she tracked the financial statements and kept the accounting books for the partnership exactly as she had for Sea Shell.  No changes were made until after decedent's death.  This testimony does not explain how the personal residence was not a partnership asset.  Instead, it demonstrates the estate's complete disregard for the formalities of financial statements.

Based on the record as a whole, we reject the estate's claims that the partnership agreement changed any real relationship between Hillgren and decedent or that it changed decedent's interest in the properties.

3.  Distributions From LKHP

The estate admits that decedent received all of the income distributed from the partnership in the 5 months preceding her death.  The estate further admits that decedent was dependent on the cashflow from the partnership for her living expenses.  The estate claims that, presumably, Hillgren would have received cash distributions as well if decedent had remained alive through the end of the year.  In addition, the estate claims that there was no history of disproportionate distributions because the 5 months of partnership distributions was too short to create a pattern. Respondent argues that there was an implied agreement, as

demonstrated by the record, relating to the funding, operations, and distributions of the partnership so that decedent retained the right to the income of the partnership.

During 1997, decedent received $99,363 in distributions from the partnership, and Hillgren received no distributions. When questioned by the estate's counsel, Hillgren described the situation surrounding the disproportionate distributions as follows:

> Q    Would you tell us about those cash distributions? Were they disproportionate, and if so, why?
>
> A    To date, to her date of death, they were, in fact, disproportionate. I took no distributions. She took all of them.
>
> Q    And why did you distribute entirely to her, and nothing to you?
>
> A    Well, in that I had a 25 percent--it was a calculated number, and we didn't have--obviously, the books--we were only five months into the or six months into the accounting year. We had no information as to what my 25 percent would be.
>
> Q    Why didn't you then withhold distributions to either of you until those numbers could be calculated?
>
> A    Well, the distributions were discretionary on my part. If we had erred, and distributed too much, for example, it would have just gone against he--or would gone into my--added to my capital account. So it would have worked out in the end eventually, if we had made that mistake, and overdistributed.
>
> Q    Well, let's see if I understand it. Why did you distribute anything to her?
>
> A    All of the--all of her income producing assets were in the partnership. So her--that's what she

> needed to live on. She wanted the income, or those
> monies for living expenses * * *.

Hillgren's explanation only underscores the intention to use the partnership assets to support decedent. Further, it is not apparent from the record that Hillgren would ever have received a distribution from LKHP. Overall, the record shows that the partnership distributions were intended to provide decedent with her living expenses, further demonstrating that her relationship to the LKHP properties remained the same after formation of the partnership and that LKHP should be disregarded for estate tax purposes.

### 4. Formality of the LKHP Agreement

Hillgren did not file a certificate of limited partnership until respondent began examination of the estate's return. Striking features of LKHP were the lack of formality surrounding the partnership, the intention of the parties to keep the agreement largely invisible, the apparent disregard of the agreement as situations arose, and the restatements of the financial affairs by Hillgren and representatives of the estate.

Hillgren and Albrecht took advantage of apparent inconsistencies in the partnership agreement regarding Hillgren's interest when reporting Hillgren's interest on the estate tax return and on the partnership tax returns. On the estate tax return, the estate reported that Hillgren had a 25-percent profit interest to increase the discount on the estate tax. On the

other hand, on the partnership tax return, Hillgren reported a .05-percent profit interest so more income from the partnership could bypass him and go to the trust that provided for his children. The discrepancy was not fixed until after the examination of the estate tax return had begun. Hillgren then caused amended partnership tax returns to be filed for 1997, 1998, and 1999.

During trial, Albrecht was questioned by respondent as to why he took inconsistent positions on the estate tax return and on the partnership return regarding Hillgren's interest in the partnership. Albrecht testified that, because decedent had died and because the amended trust provided for disposition of her estate to Hillgren's children, the estate could essentially disregard the provisions of the partnership agreement by interpreting Hillgren's partnership interest in a way that would benefit his children and beneficiaries of decedent's estate. The income not allocated to Hillgren would not flow through the partnership or subject him to income tax on the distributions and ultimately would not pass through Hillgren's estate.

Hillgren testified regarding the discrepancy on the returns as follows:

> Q    Now, you heard counsel for respondent in his opening statement mention the fact that in the 1997 tax return for the partnership, your sister's profit interest was shown at 99.95 percent and yours was shown at either zero, or .05 percent, instead of 25/75. Why was that?

A    That was based on a misinterpretation of the agreement by Rick Albrecht.

*    *    *    *    *    *    *

A    He (Albrecht) advised me that he thought the agreement could be read either way, that it was confused.

Q    Either way being what?

A    With 25 percent of profits, and 25 percent of the increased profits as one way.  The other way was just 25 percent of increased profits.

Q    But you knew better, didn't you?

A    Well, I had negotiated better, yes.

Q    What did you know it to be?

A    Well, that there was 25 percent, both 25 percents apply.  The 25 percent of operational profits, and the 25 percent of increased profits.

Q    So that when Mr. Albrecht told you that in his opinion it could be interpreted differently, why didn't you object?

A    Well, he pointed out that the difference basically goes--the 25 percent of operation profits would go to my children.  There's an estate tax benefit in interpreting it that way.

Q    And so you accepted that?

A    Yes, that was his advice at the time, and I accepted it.

Hillgren further testified during cross-examination by respondent's counsel as follows:

Q    Now, let's talk about your meeting with Mr. Albrecht.  I think we said--I think you testified in direct examination that when Mr. Albrecht told you of his interpretation of the agreement, that there was a conflict, and that the agreement was susceptible of

an interpretation whereby your profits interest was limited to what the Section 3.4 provision said, i.e., 25 of any post-'96 increases, did you agree with that interpretation?

A    That was not how I had understood the document to be, but he told me that that--it could be interpreted that way, and that the benefits of using that interpretation would be because basically that 25 percent would belong to my children, it would be beneficial.

Q    If Lea were still alive, and Mr. Albrecht had told you that that was his interpretation, what would have been your response?

A    Oh, absolutely not.  I mean, that would be cheating money from Lea.

Q    That would be what?

A    That would be cheating her of money, of--

Q    Cheating her, or cheating you?

A    Well, it would be--yeah, I'm sorry, cheating me of money.

*    *    *    *    *    *    *

Q    So why did you go along with Mr. Albrecht's interpretation?

A    He--well, first of all, Lea was dead, so it was not an issue between she and I, it was basically an issue between my children and I, and it would be beneficial for my children to have that 25 percent, not me.

The estate contends that Hillgren received "faulty legal advice" that induced him to take advantage of an ambiguity in the partnership agreement for a tax benefit.  The estate further contends that the faulty advice created the inconsistency between the estate tax return and the partnership tax returns.  Hillgren,

however, was sophisticated in real estate and business matters and was aware that Albrecht was interpreting the partnership agreement in a way that was incorrect. During trial, Hillgren admitted that he knew better and that he had negotiated better, yet he was willing to take the inconsistent positions on the returns knowing that it would benefit his children and, implicitly, that he would avoid or reduce tax on the distributions.

Respondent also questioned why Albrecht instructed M. Higgins to appraise the limited partnership interest as though Hillgren had a 25-percent profit interest, although the partnership tax returns were filed with a .05-percent interest. Respondent's questions related to a letter written by Albrecht to Higgins, Marcus & Lovett, Inc., regarding how to appraise Hillgren's interest. Albrecht testified as follows:

> Q   You advised Mark Higgins to appraise the partnership interest as though Mark Hillgren had a 25 percent profits interest in the partnership, correct?
>
> A   Well, I don't know if I did or not, or whether I'm--
>
> Q   You can take a minute and look at the letter if you need to.
>
> A   Well, I don't know--I just don't recall, I--this letter is obviously written as a response to the report that they had written and I would have to compare it to the report to see what I actually recommended by this.
>
> I--it's obviously something that I had my office type up, and I signed the letter, but I would have to

look at the report to compare it to what I was really trying to accomplish here.

Albrecht's explanation of his instructions was evasive at best and further demonstrates the estate's inconsistency with regard to the partnership overall.

In addition, Hillgren and decedent had a history of producing incorrect or incomplete financial records. Hillgren and Gates both testified that Sea Shell's balance sheets and financial records had arbitrary and imperfect numbers. Hillgren described financial statements that were produced by MSL in 1994 as follows:

> They are strictly an arbitrary--they're not based on appraisal, they're not based on cost, they're not based on anything other than an arbitrary--well, a guesstimate, per foot value times the number of feet for each location.
>
> As the market collapsed in the early '90s, we did not adjust these down. * * * [T]hey had been used for external purposes.

Despite their inaccuracies, the balance sheets were used for external purposes. They were provided to the lender during the refinancing of the Nordica properties to show that decedent had equity in the University property. For example, Sea Shell's balance sheet as of July 31, 1994, as provided to respondent during the audit, represented that the value of the University property was $4,287,500. The Safeco and Huettner loans were shown on the balance sheet in the amounts of $1,260,419.03 and $1,481,567.95, respectively. The balance sheet therefore

indicated that the University property had approximately $1.5 million in equity. Hillgren represented in the BLA and during trial, however, that the University property was "underwater" because the debt exceeded the equity at the time that Hillgren and decedent entered into the BLA.

5. Conclusion

The estate claims that decedent was "in excellent physical health, on new antidepressant medication, and not contemplating suicide" and that, therefore, the partnership was not an alternate testamentary vehicle. The evidence contradicts this claim. Shortly before her death, decedent attempted suicide, was on various medications, was under the care of a psychiatrist, and suffered from severe pain due to degenerative disc disease. After her initial suicide attempt, LKHP was formed.

Decedent and Hillgren started many businesses over the years and disregarded entities as they saw fit, making various "situational representations", i.e., statements about their property ownership and values to support a then existing purpose, without regard to accuracy. Even the stipulated facts contain inconsistencies regarding entity names and dates of creation and dissolution. The stipulations of the parties were often contradicted by the documents that were provided by Hillgren. Hillgren and the estate's representatives continued to disregard the LKHP agreement both prior to and after decedent's death.

The value of the properties that were transferred to the partnership is includable in decedent's gross estate under section 2036(a). The properties are included in the estate at the fair market value on the date of decedent's death, subject to the effect of the BLA.

Valuation of the Properties

The parties have stipulated the undiscounted values of all seven properties in which decedent had an interest. Three of the properties, Manzanita, Crescent Bay, and Railroad, are not subject to the BLA. The three properties will therefore be included in the value of the estate at stipulated values of $2,261, $265,176, and $115,711, respectively.

Property is included in the gross estate at its fair market value, which is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Sec. 20.2031-1(b), Estate Tax Regs.; Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990). The determination of fair market value is a question of fact. Estate of Newhouse v. Commissioner, supra at 217. During trial, we received reports and testimony from expert witnesses. We evaluate the opinions of the experts based on the qualifications and reasoning of each expert and on all other credible evidence in the record. See Estate of Jones v.

Commissioner, 116 T.C. 121, 131 (2001). We are not bound by the expert opinions, and we may determine value based on our own examination of the record. It is the responsibility of the parties to instruct the experts of all the relevant facts that might affect the valuation. Estate of Hall v. Commissioner, 92 T.C. 312, 338 (1989). If the parties fail to provide the experts with complete information concerning material facts or reasonable assumptions to be made, the reliability of the experts is undermined. Prior to trial, respondent instructed his experts to value the LKHP properties as if the BLA encumbered only the University property. At the conclusion of testimony in this case, the Court agreed with the estate's contention that the exhibits to the BLA were inadvertently switched and that the BLA encumbered the Orange County properties as well as the University property. The Court further concluded that the BLA did not terminate at decedent's death. Nonetheless, in the briefs, respondent argues that the BLA should be disregarded, that the BLA terminated at the death of decedent, that the exhibits to the BLA were not mistakenly switched, and that the BLA encumbered only the University property.

The estate contends that the BLA was: (1) A contract for services provided by Hillgren who would facilitate the forbearance and extensions of the Puccio, Huettner, and Safeco loans; (2) a loan guaranty agreement where Hillgren agreed

personally to guarantee the Puccio and Safeco loans; (3) a loan agreement where Hillgren extended a $1 million line of credit to decedent; and (4) a security agreement encumbering the three Orange County properties, giving Hillgren the authority, for 29 years, to determine whether to sell any of the four properties subject to the BLA and to grant an irrevocable power of attorney to Hillgren for the duration of the ownership of the properties. Because Hillgren had performed under the agreement, he was entitled to be compensated under it, regardless of the death of decedent. We agree with the estate's analysis.

Respondent contends that the BLA was superseded by the LKHP partnership agreement, and the estate argues that the subject matter of each agreement was separate. We have decided that the partnership agreement was not respected by decedent or Hillgren and will be disregarded. The BLA, however, had apparent business purposes. Moreover, a hypothetical buyer would not disregard or ignore the BLA. See Estate of Newhouse v. Commissioner, supra at 231; Estate of Hall v. Commissioner, supra at 338-339. As a result, we value the University property and the Orange County properties subject to the effect of the BLA.

The Higgins appraisal attached to the estate tax return assumed, based on Albrecht's erroneous instructions, that Hillgren held a 25-percent operational interest and a .05-percent profit interest. The Higgins appraisal essentially used the

existence of the BLA as a factor in determining the discounts to apply to decedent's partnership interest.

Carsten Hoffman, senior vice president of FMV Opinions, Inc., of Irvine, California, prepared three appraisals for the estate during trial preparation. The Hoffman appraisal relied on information that was provided by Hillgren and by the estate's representatives and relied on the property values that were used in the Higgins appraisal. The first report, dated February 22, 2002, appraised the value on June 5, 1997, of the Orange County and University properties as subject to the BLA (Hoffman appraisal). The other two appraisals valued partnership interests that are irrelevant at this point in our analysis.

The Hoffman appraisal determined that, because of the BLA, an investor in the real estate lacked control of and marketability of the investments in the real estate. The report compared these restrictions to those based on limited partnership interests in real estate holding partnerships. The report also applied additional discounts for lack of voting rights. The Hoffman appraisal made the assumption that the BLA was "fully transferable to a third-party upon giving notice and that the * * * [BLA] remains in full force and effect upon such transfer". The Hoffman appraisal took into consideration that the exhibits to the BLA were transposed. In addition, the Hoffman appraisal

considered that a hypothetical willing buyer would know of the existence of the BLA.

Raynor Klaris (Klaris) and John A. Thomson (Thomson) of Klaris, Thomson & Schroeder, Inc., prepared two appraisal reports for respondent (respondent's appraisal). Klaris has been in the appraisal business since 1961 and is a Senior Accredited Member of the American Society of Appraisers with a specialty in business valuations. Thomson has been an appraiser since 1976 and received his Accredited Senior Appraiser designation in business valuations and intangible properties in 1982. Thomson is also a real estate appraiser. Both of respondent's appraisals assumed that the BLA affected only the University property and not the Orange County properties. As in Estate of Hall v. Commissioner, supra, although respondent's experts were qualified, they were hindered in their valuation by respondent's incorrect instructions regarding the effect of the BLA.

1. The University Property

The parties agree that the undiscounted value of decedent's interest in the University property is $1,074,131. Based on the terms of the BLA, Hillgren held a 25-percent lender interest in the net proceeds from sale or refinancing of the University property. The Hoffman appraisal therefore reduced the value of the University property by 25 percent to represent Hillgren's interest. Respondent's appraisal also reduced the value of the

University property representing the 25-percent lender interest. As a result, the value of the University property becomes $805,598, the value to which the parties agree. The issue then becomes whether any additional discounts should be applied for lack of marketability, lack of control, or lack of voting rights.

The Hoffman appraisal compared the University property to real property limited partnerships (comparable partnerships) with revenues less than $3 million and with debt to total adjusted capital greater than 20 percent. The discounts of the comparable partnerships ranged from 24.7 percent to 57.8 percent and had a median of 41.5 percent. The Hoffman appraisal also compared the University property to comparable partnerships with net asset values less than $10 million and with debt to total adjusted capital greater than 20 percent. The discounts that were applied for the comparable partnerships ranged from 28.3 percent to 56.9 percent and had a median discount of 43.9 percent. The Hoffman appraisal also compared the University property to comparable partnerships based on performance as measured by distributions. The discounts for the comparable partnerships ranged from 24.7 percent to 62.3 percent and had a median of 42.4 percent. In each of the three comparisons, the Hoffman appraisal concluded that the University property was a less attractive investment than the comparable partnerships.

Taking into account the comparable partnerships, as well as other factors regarding the University property's marketability, the Hoffman appraisal applied a combined discount for lack of control and lack of marketability of 50 percent. The Hoffman appraisal also applied a 5-percent discount for lack of voting rights. The Hoffman appraisal therefore applied a total combined discount of 55 percent to the University property in addition to the discount representing the 25-percent lender interest. The significant discount that was applied to the University property was due in part to the high level of debt on the property.

Respondent's appraisal used a discounted net asset value approach and reduced the value of the University property by a 10-percent minority interest discount and a 35-percent discount for lack of marketability. The minority discount was determined by comparing the University property to closed-end equity funds and real estate investment trusts and by taking into consideration the effect of the BLA. The lack of marketability discount was determined by comparing six separate independent studies of restricted stock transactions. The discounts that were applied by respondent's appraisal allowed for an overall combined discount of 41.5 percent. The estate's brief points out that respondent's appraisal contains incorrect assumptions about cashflow and the effect of the BLA.

The estate's suggested 50-percent discount for lack of control and lack of marketability would not reduce the value of the properties below the value reported on the estate tax return. The estate is not seeking to establish a value less than that reported on the estate tax return. The Hoffman opinion on discounts is reasonable and is not contradicted by reliable evidence. Thus we adopt it. See, e.g., Estate of Hall v. Commissioner, 92 T.C. at 342.

2. The Orange County Properties

The Hoffman appraisal used a similar analysis for the Orange County properties as it used for the University property, looking to discounts for comparable partnerships. Therefore, the Hoffman appraisal applied a 35-percent combined discount for lack of marketability and lack of control on the West Collins property, a 35-percent combined discount on the Enterprise property, and a 40-percent combined discount on the North Main property. The Hoffman appraisal also used an additional 5-percent discount for lack of voting rights on each of the three properties.

Respondent's appraisal did not discount the three Orange County properties based on the effect of the BLA. Thomson testified that, had he assumed that the BLA also encumbered the Orange County properties, the Orange County properties would also be discounted but at a different discount than that determined for the University property. Thomson estimated discounts of

30 percent on West Collins, 35 percent on North Main, and 30 percent on Enterprise.  Because the difference between the parties' discounts on the Orange County properties is insubstantial, we accept the estate's discounts of 35 percent, 40 percent, and 35 percent for West Collins, North Main, and Enterprise, respectively.

The estate's experts suggest an additional discount of 5 percent for lack of voting rights.  Thomson testified that an additional lack of voting rights discount would be appropriate between 2.5 percent and 5 percent and thus did not disagree with the estate's experts.  Thus, we accept the 5-percent discount for lack of voting rights.

Conclusion

We conclude that the properties in which decedent had an interest should be valued and discounted in accordance with this opinion, but not reduced below the value reported on the estate tax return.

We have considered all of the remaining arguments made by both parties for a result contrary to that expressed herein, and, to the extent not discussed above, they are irrelevant or without merit.  To reflect the foregoing and to give effect to the stipulations by the parties,

Decision will be entered under Rule 155.